UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

RODNEY R. SIERZ,

    Defendant.
_____/

CRIMINAL NO. 07-20472

DISTRICT JUDGE VICTORIA A. ROBERTS

MAGISTRATE JUDGE DONALD A. SCHEER

# REPORT AND RECOMMENDATION

**I.**    **RECOMMENDATION**:

I recommend that Defendant Rodney R. Sierz's Motion to Suppress Evidence be denied.

**II.**    **REPORT:**

    **A.**    **Procedural History**

Defendant Rodney R. Sierz was charged by Grand Jury Indictment, on September 25, 2007, with Conspiracy to Possess With Intent to Distribute Cocaine (Count I) and Possession With Intent to Distribute Cocaine (Count III). Counsel was appointed, and Defendant entered a not guilty plea on October 17, 2007. On November 14, 2007, Defendant filed a Motion to Suppress Evidence, challenging the seizure of a quantity of seized from a vehicle in which he was riding on September 14, 2007. The motion was referred to the magistrate judge by Order of Reference on November 15, 2007. The government filed its Brief in Opposition to the motion on November 30, 2007.

The motion was brought on for hearing on December 17, 2007, January 25, 2008 and April 4, 2008.[1] The motion was taken under advisement, and the parties were directed to submit supplemental briefs. Defendant submitted his supplemental brief on June 13, 2008. The government filed its Supplemental Brief on July 14, 2008. Defendant filed a Reply Brief on July 30, 2008.

**B.    Factual Record**

Defendant is one of five defendants charged in the conspiracy count. The instant Motion to Suppress is one of four filed in the case. Those motions were brought on for hearing together. In a Report and Recommendation of September 23, 2008, I recommended that the Motion to Suppress filed by Co-Defendant Cardell Clinton Campbell be denied. That report contains various findings of fact, each of which is incorporated into this Report by reference. Those facts are summarized below.

On September 14, 2007, members of the FBI Violent Crime Task Force were engaged in an active investigation of Cardell Clinton Campbell. The investigation had commenced during the previous month, based upon information received from a confidential informant ("CI"). The informant reported that an individual known to him as "Skip" was a multi-ounce level cocaine dealer from whom he had purchased drugs on prior occasions. The CI provided a physical description of Skip. In addition, he provided the suspect's address (6700 Iowa Street, Detroit, Michigan) and indicated that he drove a green Cadillac. Utilizing the CI information, the task force identified the suspect as Clinton

---

[1] Each session of the evidentiary hearing resulted in a separate volume of transcript which are designated T1 (December 17, 2007), T2 (January 25, 2008) and T3 (April 4, 2008).

Campbell. The informant confirmed the identification based upon Campbell's Michigan driver's license photo. A criminal history check revealed that Campbell had a record of conviction for felony drug offenses. The accuracy of the informant information was confirmed by means of a "controlled purchase" of drugs by the informant from Campbell, under task force surveillance, during the two week period preceding September 14, 2007. The CI alerted the task force that Campbell had "just recently hooked up with a supply of a couple of kilogram quantities of cocaine which he was off-loading for approximately $25,000.00 per kilogram."

Task force agents were engaged in surveillance of Campbell's Iowa Street residence on September 14, 2007. Campbell and a female companion were observed to depart that location in a green Cadillac. They were followed to 12666 Mendota Street, in Detroit, where the Cadillac was seen to enter the driveway. Task force surveillance was unable to observe the Cadillac or its occupants' activities at the Mendota address. By the time the moving surveillance was able to return to that location, the Cadillac was observed backing out of the driveway, only a few minutes after its arrival. Based upon that observation, the information from the confidential source and Defendant's prior criminal history, Agent Malagrida suspected that Campbell had conducted a drug transaction at the Mendota location. An order was issued by radio that the green Cadillac should be subjected to a traffic stop.

A unit of the Wayne County Sheriff's Department had participated in a Violent Crime Task Force meeting during the morning of September 14, 2007. Deputies Lilly and Smith were informed of Campbell's status as a drug trafficking suspect, and of the information provided by the confidential informant. They were instructed to stand by for a possible

3

signal to stop Campbell's vehicle for an observed traffic violation. That signal was given following the departure of the green Cadillac from the Mendota address, and Lilly stopped Campbell's vehicle after observing an unsignaled turn. Based upon the task force briefing, Campbell's extreme nervousness upon his approach, and his sighting of what he concluded to be an effort on the part of the female passenger to conceal something in the vehicle, Lilly summoned a certified narcotics detection canine unit. Based upon the positive alert of the dog, Lilly recovered from the green Cadillac approximately one kilogram of a substance which tested positive for cocaine. Campbell was taken into custody. (See 9/23/08 R&R, Docket #73).

I find the following additional facts, particularly relevant to the instant motion, to be substantially undisputed. Accordingly, I submit a summary in lieu of particularized individual findings.

At approximately 3:15 p.m. on September 14, 2007, task force surveillance agents observed a white Cadillac, occupied by two subjects identified as Defendants Thrillden Holmes and Matt Stewart, leave the 12666 Mendota Street residence. Both Holmes and Stewart were identified by name and driver's license photograph, and each was determined to have a prior drug conviction. (T1: 26-27 Sorce; T2: 209-11 Malagrida). At approximately 4:28 p.m., after the cocaine seizure from Campbell, a tan Ford Explorer was observed arriving at the Mendota address. (T2: 167 Hartman). The Explorer was occupied by a white female driver and a white male passenger. A record check on the registration tag revealed that the Explorer was owned by Kelly Jo Lamero, of Grand Rapids. (T1: 31, 59 Sorce; T2: 194 Hartman). The vehicle was parked on the street in front of the

residence, and both occupants remained inside.  The male was observed to be using a telephone.  (T2: 167 Hartman).

At approximately 4:48 p.m., the white Cadillac returned to 12666 Mendota and proceeded up the driveway to the rear of the residence.  (T2: 168 Hartman).  At approximately 4:50 p.m., the tan Explorer pulled into the driveway behind the white Cadillac.  (T2: 168-69, 189, 196 Hartman).  Both vehicles were then out of sight of the surveilling agents.  At approximately 4:55 p.m., the Explorer departed the Mendota address.  (T2: 169 Hartman).

The tan Ford Explorer proceeded, under surveillance, from Mendota Street to west-bound I-96.  (T1: 29 Sorce).  As it proceeded on that roadway, Task Force Agent Art Wimmer maneuvered his Suburban surveillance vehicle to a position abreast of the passenger side of the Explorer.  Wimmer observed Defendant Sierz in the passenger seat, holding a plastic bag that appeared to contain a box.  Wimmer noted that the Defendant was smiling as he looked into the bag.  (T2: 135-36 Wimmer).  Wimmer then saw the passenger lean toward the back of the seat and place the bag behind the driver's seat.  (T2: 147).  Both Sorce and Wimmer were in plain clothes and were operating unmarked vehicles.  (T1: 72-73 Sorce).  Upon receiving a radio report of Wimmer's observations, Special Agent Sorce directed Wimmer to make arrangements for a marked police unit to stop the tan Explore.  (T1: 30 Sorce; T2: 137 Wimmer).  At Wimmer's request, a Livonia Police Department scout car stopped the vehicle on I-96 near the Levan Street exit.  (T2: 149-50 Wimmer; T1: 73-74 Sorce).

Special Agent Sorce was following behind the tan Explorer when he received Wimmer's report of Sierz holding and looking into the package.  (T1: 29-30).  When he

arrived at the vehicle stop on I-96 and Levan, he saw the Livonia Police Officers bringing the female driver toward the rear of the Explorer. (T1: 73-75 Sorce). She was identified as Kelly Jo Lamero, the owner. (T1: 31). Sorce identified himself, advised Lamero of her rights, and "asked where they had been, or basically what they were doing in Detroit." Lamero responded that she and her boyfriend had left Grand Rapids, driven to a mall to purchase shoes, and were returning to Grand Rapids. (T1: 30). Sorce asked her if there were any narcotics in the car. She said that there were none to her knowledge. Sorce then asked for consent to search the vehicle. Lamero granted consent. (T1: 31).

As Agent Sorce was communicating with the Ms. Lamero, Wimmer was at the side of the Explorer. (T2: 137). As the passenger (Sierz) got out of the vehicle, Wimmer walked him back behind it. At that point, Sorce informed Wimmer that he had obtained consent from the owner to search the vehicle. (T2: 137). Wimmer returned to the Explorer and found the same plastic bag that he had previously observed. Inside of the bag was a shoe box. Inside of the shoe box was "like a brick of cocaine." (T2: 137). There was no other bag in the Explorer. (T2: 147). Lamero and Sierz were taken into custody by the Livonia Police Department and transported from the scene. (T1: 31 Sorce). The task force members returned to the Mendota Street location to resume surveillance. (T1: 31-32).

The Fourth Amendment to the Constitution of the United States guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const., Am. IV. When an officer, by force or show of authority, has restrained the liberty of a citizen such that, in view of all the circumstances surrounding the incident, a reasonable person would believe that he was not free to leave, a seizure has occurred. United States v. Mendenhall, 446 U.S. 544, 554-

6

55 (1980). The temporary detention of an individual during a police stop of a vehicle, regardless of the limited purpose or the duration constitutes a "seizure" within the meaning of the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809-10 (1996); Delaware v. Prouse, 440 U.S. 648, 653 (1979). The stop of an automobile is reasonable, however, if police have probable cause to believe that a traffic offense has occurred. United States v. Johnson, 242 F.3d 707, 709 (6th Cir. 2001). Absent a traffic violation, police may stop and search a motor vehicle, without a warrant, when they have probable cause to believe that the vehicle contains evidence of a crime. United States v. Hill, 195 F.3d 258, 273 (6th Cir. 1999). Finally, police may lawfully stop a motor vehicle for investigative purposes if such action is supported by reasonable suspicion of criminal activity. United States v. Garcia, 496 F.3d 495 (6th Cir. 2007). Defendant Sierz maintains that none of the circumstances which might have warranted the stop of the tan Ford Explorer existed on September 14, 2007.

Initially, Sierz argues that the authorities had no probable cause to believe that Lamero had committed a traffic violation. The government concedes that argument. Sierz argues as well that the stop of Lamero's vehicle by the Livonia Police was not based upon specific and articulable facts sufficient to satisfy the standards of probable cause or reasonable suspicion. The government contests both propositions.

The government maintains that the highway stop of Ms. Lamero's tan Ford Explorer by Officers of the Livonia Police Department was supported by probable cause to believe that the occupants were involved in the distribution of controlled substances. Probable cause exits when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Padro, 52 F.3d 120, 122-23 (6th Cir. 1995)

(quoting Illinois v. Gates, 462 U.S. 213, 238 (1983). "Determinations of probable cause are based on a review of the 'totality-of-the-circumstances,' and involve a practical, commonsense review of the facts available to the officer at the time of the search." Id. at 123 (again quoting Gates); United States v. Sims, 975 F.2d 1225, 1238 (6th Cir. 1992), cert. denied, 507 U.S. 932 (1993); United States v. Nigro, 727 F.2d 100, 103 (6th Cir. 1984).

> [P]robable cause is a fluid concept - turning on the assessment of probabilities in particular factual contexts - not readily or even usefully, reduced to a neat set of legal rules. While an effort to fix some general, numerically precise degree of certainty corresponding to probable cause may not be helpful, it is clear that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.

Illinois v. Gates, 462 U.S. 213, 232 (1983). Accordingly, a review of the facts available at the time the vehicle stop was ordered is essential.

The FBI Violent Crime Task Force had information from a confidential informant that Defendant Cardell Campbell, a previously convicted drug offender, had recently obtained kilogram quantities of cocaine which he was "off loading for approximately $25,000.00 per kilo." (T2: 203 Malagrida). The informant represented that he had personally engaged in prior drug distribution activities with Campbell. (T3: 86 Malagrida). The credibility of the source information regarding Campbell had been reinforced by way of a surveilled purchase of controlled substances by the informant from Campbell during the two week period preceding the activities of September 14, 2007. (T3: 91-92 Malagrida). On that day, prior to its encounter with Defendant Sierz, the task force had followed Campbell from his Iowa Street residence directly to 12666 Mendota Street, where he remained (out of sight of the agents) for only a few minutes before departing. (T2: 205-06 Malagrida; T2: 70-74 Mendoza). Shortly after his brief stop at 12666 Mendota, and before he stopped anywhere

else, Campbell had been found to be in possession of a kilogram of cocaine. (T1: 84-130; T2: 7-34 Lilly).

Task force investigation of 12666 Mendota, and vehicles parked there, connected that location to Defendants Holmes and Stewart, each of whom was also confirmed to be a prior convicted drug offender. (T2: 165-66 Hartman; T1: 26-27 Sorce; T2: 210 Malagrida). Task Force Agent Hartman observed Holmes' white Cadillac depart the Mendota address at approximately 3:10 p.m., shortly after he had watched Stewart exit the residence, reposition his black Ford Windstar and reenter the house. (T2: 166-67). Special Agent Sorce observed two subjects in the Cadillac when it left Mendota. (T1: 28). At approximately 4:28 p.m., after the kilogram of cocaine was seized from Campbell, and while the two subjects in Holmes' white Cadillac were away from the Mendota location, Agent Hartman observed a tan Ford Explorer arrive there, pull briefly into the driveway, back out and come to rest on the street in front of the residence and behind Stewart's black Windstar. Hartman observed a female driver and a male passenger, who was using a telephone. (T2: 167). A registration check revealed that the Explorer was owned by Kelly Jo Lamero, who had a Grand Rapids address. (T1: 31, 59; T2: 194).

The tan Ford Explorer and its occupants remained in place until approximately 4:48 p.m., when Hartman observed Holmes' white Cadillac return to the Mendota address and pull up the driveway all the way to the back of the property, out of his view. The agent then observed the female driver back the Explorer up and pull into the driveway behind the Cadillac. (T2: 168). Approximately five minutes later, he saw the tan Explorer depart Mendota, and he called for surveillance to follow it. (T2: 169).

9

Several surveillance agents, including Sorce and Wimmer, monitored the Explorer as it left Mendota Street and proceeded onto westbound I-96 (toward Grand Rapids). A short time thereafter, and before it made any other stops, Agent Wimmer was able to observe Defendant Sierz, in the passenger seat, expressing obvious pleasure as he examined the interior of a plastic bag containing a boxlike object. (T2: 135-36). It was only upon Wimmer's report of his observation that Agent Sorce directed that the tan Ford Explorer be stopped for investigation of suspected drug distribution activity. (T1: 72).

I am satisfied that, at the time Special Agent Sorce ordered a highway stop of the Ford Explorer, the task force had probable cause to believe that the occupants had committed a drug offense and/or that evidence of a drug offense would be found in it. By that point in time, the involvement of Defendant Cardell Campbell in drug trafficking activities had been amply established. Only hours earlier, Campbell had been surveilled to 12666 Mendota Street and, shortly after his brief stay there, had been found to be in possession of a kilogram of cocaine. The Mendota Street address had been linked to Defendants Thrillden Holmes and Matt Stewart, each of whom, like Campbell, was confirmed to have been convicted of a drug related felony. Following the seizure of cocaine from Campbell, surveillance agents observed two subjects depart the Mendota address in Holmes' white Cadillac. Lamero and Defendant Sierz arrived at Mendota in the tan Explorer during their absence. Neither attempted to enter the residence, but Sierz was seen to be using his telephone. After a twenty minute delay, Holmes' white Cadillac returned and proceeded to a point in the driveway beyond the agent's view. Almost immediately, Lamero and Sierz proceeded in the Explorer to the same location, only to depart the premises a few minutes later. Their very brief stay, in an area of the property

10

not readily observed, was similar to the activity exhibited by Campbell shortly before he was found in possession of a kilogram of cocaine.

It is intuitively obvious, and widely understood, that narcotics transactions are generally accomplished during brief and discreet encounters. While (a) a drive of more than 150 miles from Grand Rapids to the Detroit address (b) of a convicted drug felon, (c) followed by a 20 minute curbside wait involving only cell phone communication, (d) followed by the arrival of two subjects in an automobile registered to a second convicted drug offender, (e) which car is driven to the least observable portion of the property, (f) only to be followed almost immediately by the out of town vehicle, (g) which departs the premises minutes later and (h) enters a westbound freeway leading out of the city, (i) only hours after a similar encounter, (j) at the same location, involving (k) another convicted drug offender (l) led to a cocaine seizure, is not prima facie proof of a narcotics transaction, it is certainly consistent with that conclusion. Surveillance of the Explorer commenced immediately upon its departure from Mendota. While Lamero was proceeding in the direction of her home, Sierz was observed happily examining the contents of a shopping bag with a box like object within it. While such conduct is not clear evidence that the package had been acquired at the Mendota address, it is, once again, fully consistent with that proposition. Sierz had been under surveillance at Mendota for 20 minutes, but had exhibited neither the package nor the enthusiasm for its contents which he demonstrated to Wimmer on his way out of town. It is fair to infer that the package was more likely than not received by him at the Mendota residence.

A probable cause determination does not require that every contrary hypothesis be excluded. United States v. Wagers, 452 F.3d 534, 542 (6th Cir.), cert. denied, 127 S.Ct.

596 (2006). The theoretical possibility that Lamero and Sierz had traveled to Mendota to borrow a cup of sugar does not undermine the agents' conclusion that criminal conduct was afoot.

> [J]udges are not philosophers. To find probable cause, the law does not require that we rule out every conceivable explanation other than a suspect's illegal conduct. Instead, we need only consider whether there are facts that, given the factual and practical considerations of everyday life, could lead a reasonable person to believe that an illegal act has occurred or is about to occur.

United States v. Strickland, 144 F.3d 412, 416 (6th Cir. 1998). Viewing all of the facts known to the members of the Violent Crime Task Force, I am satisfied that they had established "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion," that there was a "fair probability that contraband or evidence of a crime" would be found in the tan Explorer. United States v. Padro, 52 F.3d 120, 122-23 (6th Cir. 1995).

It is important to note that a finding of probable cause is not essential to the propriety of the traffic stop of the Explorer. A law enforcement officer may conduct an investigatory stop if it is supported by "reasonable suspicion" of criminal activity. Terry v. Ohio, 392 U.S. 188 (1968); United States v. Garcia, 496 F.3d 495 (6th Cir. 2007). The Supreme Court has declared that reasonable suspicion is a less demanding standard than probable cause, and requires only some minimal level of objective justification for making the stop. United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting INS v. Delgado, 466 U.S. 210, 217 (1984)).

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain

> common sense conclusions about human behavior; jurors as fact-finders are permitted to do the same - and so are law enforcement officers.

Sokolow, 490 U.S. at 8 (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)). The Court in Cortez further emphasized that "the evidence . . . collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." 449 U.S. 411, 418 (1981). The court recognized that trained law enforcement officers may legitimately draw "inferences and deductions that might well elude an untrained person." Id., at 418. Viewing the totality of the circumstances known to the task force prior to the order to stop the tan Explorer, I am satisfied that its members were aware of specific and articulable facts which gave rise to a reasonable suspicion that evidence of drug trafficking might be found there.

Defendant argues that, "[e]ven if this court find that the circumstances did give rise to reasonable suspicion . . ., the Livonia Police officers who conducted the actual stop cannot be presumed privy to this reasonable suspicion." (Defendant's Brief, Page 8). He correctly observes that the Livonia Police made the stop on Wimmer's telephonic request, and there is no evidence to support the inference that he made them aware of the underlying facts constituting probable cause/reasonable suspicion to justify such action. I find the argument unpersuasive. Even in circumstances in which an arresting officer has nothing more than a bulletin from another police organization that a person is suspected of a criminal offense, an investigatory stop of the subject would be constitutionally justifiable by objective reliance on the bulletin, so long as the police who issued it possessed a reasonable suspicion justifying the stop. United States v. Hensley, 469 U.S. 221 (1985). Defendant's reply brief acknowledges the validity of the collective knowledge doctrine which

proceeds from the decision of the United States Supreme Court in Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560 (1971). Sierz merely argues that the rule only applies where the officers transmitting the arrest request are possessed of probable cause or reasonable suspicion to support it. For all of the reasons discussed in the earlier sections of this report, I conclude that the violent crime task force was possessed of more than sufficient reliable information to justify both their arrest request and the objective reliance upon it by the Livonia Police Department. The arrest request was issued by Special Agent Sorce, and relayed by Task Force Agent Wimmer. I am fully satisfied that the information shared among the task force members at the morning briefing, and by way of radio traffic during the subsequent investigative operations, was sufficient to justify the stop and brief detention of the Explorer and its occupants. The testimony of Special Agent Sorce establishes that Ms. Lamero granted a knowing and voluntary consent to the search of her vehicle. That testimony is unrebutted. Even in the absence of consent, I am satisfied for the reasons stated earlier in this report that the agents had sufficient probable cause to search the vehicle under the automobile exception to the warrant requirement. "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." Pennsylvania v. Labron, 518 U.S. 938, 940 (1996).

For all of the above reasons, I recommend that Defendant Sierz's Motion to Suppress Evidence be denied.

III. **NOTICE TO PARTIES REGARDING OBJECTIONS:**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof

as provided for in 28 U.S.C. Section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. United States v. Walters, 638 F.2d 947 (6th Cir. 1981), Thomas v. Arn, 474 U.S. 140 (1985), Howard v. Secretary of HHS, 932 F.2d 505 (6th Cir. 1991). Filing of objections that raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. Smith v. Detroit Federation of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987), Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall not be more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Donald A. Scheer  
DONALD A. SCHEER  
UNITED STATES MAGISTRATE JUDGE

DATED: October 7, 2008

---

### CERTIFICATE OF SERVICE

I hereby certify on October 7, 2008 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to the following non-registered ECF participants on October 7, 2008: **None.**

s/Michael E. Lang  
Deputy Clerk to  
Magistrate Judge Donald A. Scheer  
(313) 234-5217